UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | NO. 1:11-CR-0042-001GMS |
| | : | |
| CHRISTOPHER J. TIGANI | : | |


**DEFENDANT'S SENTENCING MEMORANDUM**


I. **INTRODUCTION**

This memorandum is submitted on behalf of Christopher Tigani, who respectfully

requests a sentence to supervision in home confinement with appropriate conditions, community

service, followed by lengthy probation, in lieu of imprisonment.

Mr. Tigani, age 41, is a first-time non-violent offender and a devoted father to two young

sons.  He deeply regrets his actions which led to his guilty plea.  He accepts full responsibility

for his conduct and is profoundly sorry for the error in judgment that it represents.  That illegal

conduct ceased over three years ago, before the government investigation began.  It was an

aberration in an otherwise productive, law-abiding life.  Mr. Tigani is a forward-looking person

and has set out to correct past mistakes.  He began paying his debt to the Internal Revenue

Service (IRS) and child support, mended the rift from the separation of the family business, and

started a new business whose sales and employment are rising steadily.  He will never repeat

these criminal acts which brought him to this most critical moment in his own life and that of his

young family.

1

Incarceration will not serve the goals of federal punishment as Congress intended. Mr. Tigani prays that the Court will judge him for the hard work, dedication to family, and community service that he has shown throughout his life, and for his work to build a new company employing five individuals and four contractors. It is this new company which will enable him to complete the payment of his tax obligation, make restitution, support his children, and enable his employees and contractors to pay their taxes and support their families.

During the past three years, Mr. Tigani has lived through the disintegration of his finances, loss of employment, foreclosure on his home, personal bankruptcy, defending a very public trial in Chancery Court over his family business, withstanding a challenge to his new company's liquor license, and seeing the new business show a very promising first year of sales. If this enterprise fails because he is imprisoned and unavailable to develop and run the business, not only will he be limited in his ability to meet his obligations to the government, but several people will lose their jobs as well.

Mr. Tigani's business success came with lifelong hard work. Beginning in high school under the tutelage of his beloved but now departed grandfather and uncle, he learned every aspect of the family business, NKS Distributors ("NKS"). He learned warehouse cleaning and stocking, truck driving, customer calls, finances, budgets, operations, and management. Two days after graduating from college, he was hard at work at NKS. Mr. Tigani made President of NKS at age 29, ran the company day-by-day and grew its business over ten years, so that it supported his two young sons, his mother, his brother, his father, his stepfather, his stepmother, his stepbrother, his sister, and his ex-wife.

Under his leadership, NKS provided many charitable and community services. This work grounded Mr. Tigani in the community and gave him respect for all its members. Mr. Tigani committed these offenses over three years ago and nearly two years before the investigation began. These acts do not define him. Family, friends, and community members describe Mr. Tigani as a good and decent man, a loving father devoted to his family, and a man who worked tirelessly to support his children and other family members.

Mr. Tigani's characteristics, life history, employment, his past and present contributions to the Delaware economy, and questions about the current state of the law of corporate campaign contributions all provide a basis for a variance downward from the sentencing guidelines. Mr. Tigani has separately filed under seal a motion for a downward variance in his sentence on additional grounds, including his immediate and substantial cooperation in federal and state law enforcement investigations of illegal conduct in connection with campaign fundraising activity, and other concrete and significant acts demonstrating his rehabilitation.

## II. THE PRESENTENCE REPORT

Mr. Tigani has fully reviewed and discussed thoroughly the draft and revised Presentence Investigation Report prepared by the United States Probation Department with his counsel. He does not contest the Probation Department's determinations except the application of a multiple count adjustment of two levels upward pursuant to U.S.S.G. Chapter 3, Part D1.4. He submits that the charges in Counts 1 and 2 should "group" with the charges in Counts 3 and 4 under U.S.S.G. Chapter 3, Part D1.2(a) and (b) because the counts involve substantially the same harm, and involve the same act, transaction, or victim. The Probation Department suggests that under § 3D1.2(d), the counts in Mr. Tigani's case are not of the "same general type." Mr. Tigani

3

concurs.  But § 3D1.2(d) considers the benefit to the defendant from the criminal conduct, *see United States v. Rzeplinski*, 278 F. App'x 156, 159-60 (3d Cir. 2008) (considering defendant's monetary motivations in analysis of "same general type") (unpublished opinion).  When considering the harm to the victim, which is the subject of § 3D1.2(b), the grouping of Counts 1 through 4 is appropriate.  Although different executive agencies, the same federal government was affected by the false filings he caused.  Both the Federal Election Commission, affected by Counts 1 and 2, and the Internal Revenue Service, affected by Counts 3 and 4, have as their mission the enforcement of reporting obligations for either campaign contributions or income. Mr. Tigani freely admits that he caused false reports to be filed in a way that frustrated this same mission of each agency of the United States.  But it is for this reason that he believes his charges can and should be grouped under § 3D1.2(a) and (b).  Mr. Tigani submits that his case is consistent with the Third Circuit's holding that the government is the victim of tax evasion in *United States v. Astorri,* 923 F.2d 1052, 1056 (3d Cir. 1991).  There, by contrast, the court found that it was individuals who were victims of the wire fraud at issue in the non-grouped counts.  But unlike *Astorri*, the government is the victim of the campaign contribution charges.

### III. <u>SENTENCING FACTORS IN THE COURT'S BROAD DISCRETION</u>

The Supreme Court has instructed that a district court must (1) properly calculate the Sentencing Guidelines range of potential punishment, (2) rule on any departure motions made under the Guidelines, and (3) exercise its discretion by choosing a sentence in light of the relevant 18 U.S.C. § 3553(a) sentencing factors, regardless of whether the chosen sentence varies from that calculated under the Guidelines.  *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).  The Guidelines are now no more than a "starting point," *Gall v. United States,* 552 U.S.

4

38, 49 (2007), and the Court may determine that "a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *United States v. Langford*, 516 F.3d 205, 220 n.7 (3d Cir. 2008) (citing *Gall* and *Kimbrough v. United States*, 552 U.S. 85, 90-91 (2007)).

**A.  History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1)**

**1.  Childhood and Education**

Robert Scott Bernard, Mr. Tigani's step-brother, recalls "[e]ven as a little kid I can remember Chris being a loving, caring, considerate, honest, respectful, generous person that would do anything for anyone." 1/  Robert Tigani, Mr. Tigani's father, calls his son his "shining star"—a good kid with a giving nature and wonderful personality in whom he placed his full faith and hope for the future. 2/  Mr. Tigani's step-mother, Ms. Collins, describes Mr. Tigani as a "super kid," respectful, an excellent student, and a good-hearted person who goes out of his way to help others—a wonderful father himself. Robert Bernard, his stepfather, explains that even growing up in a challenging family situation, "Chris is and has always been a person of excellent character." 3/

Mr. Tigani's parents divorced a few years after he was born.  His father married the ex-wife of his stepfather.  The mothers raised their "swapped" step- children.  Mr. Tigani reports that he and his brother were at times victims of emotional and physical abuse by their stepmother.  Facing childhood without a parent to stand up for him in difficult situations, Mr. Tigani grew empathetic toward society's defenseless.

---

1/      Exhibit 2:  Letter from Robert Scott Bernard, step-brother.
2/      Exhibit 28:  Letter from Robert Tigani, father.
3/      Exhibit 3:  Letter from Robert Bernard, step-father.

Mr. Bernard remembers "Chris was very popular and outgoing in high school, got very good grades and never was in trouble.  Teachers and students loved him alike." 4/  He was active in Student Council, baseball, Model United Nations, football, Youth in Government, soccer, Drama Club, squash, Model Congress, Stage Crew, Close-Up, and so forth.  His early school friends have remained his friends.5/

After high school, Mr. Tigani earned a Bachelor of Science degree in Management and Marketing at Guilford College in North Carolina.  There, "he was instrumental in the formation of the first fraternity permitted by the college; in order to perform community service projects and better the institution in general." 6/  Mr. Tigani later took several courses toward a Master of Business Administration degree from the University of Delaware.

### 2.  Devotion to Sons and Family

Recognized as devoted to his two young sons, ages 8 and 10, it is crucial to Mr. Tigani that he be allowed to be present and active in their lives. 7/  "[He] takes his role as a father seriously . . . he is in constant contact and has risen above his marital status to ensure that his children have a bright future, filled with fatherhood." 8/  The boys' uncle says, "I feel very strongly that incarcerating [him] would be detrimental to these children.  They need their father, need him to be there for them at their young age to continue to guide them and show them right from wrong. 9/

---

4/      Exhibit 2:  Letter from Robert Scott Bernard, step-brother.
5/      Exhibit 4:  Letter from Bridin Reynolds, friend.
6/      Exhibit 3:  Letter from Robert Bernard, stepfather.
7/      Exhibit 4:  Letter from Bridin Reynolds, friend.
8/      Exhibit 11:  Letter from Brian DiSabatino, Chairman of St. Francis Hospital Foundation.
9/      Exhibit 2:  Letter from Robert Scott Bernard, step-brother.

His ex-wife describes him as, "an involved parent in [our sons'] school, upbringing, and social activities.  He attends doctor's appointments, parent/teacher conferences, concerts, and other school functions." 10/  Dr. Howard Borin, pediatrician, finds him "devoted, attentive and appropriate . . . I have no doubt of his positive paternal role.  His presence at office visits is consistent as is his capability of medical management during times of illness." 11/

Ms. Tigani says one son needs both personal and financial help with school and homework from speech therapists and tutors, which Mr. Tigani supports financially.12/  The children also have difficulty coping when they cannot be with their father, "whose absence during their most formative years will cause tremendous suffering." 13/

### 3.  Respect for the Less Fortunate

While Mr. Tigani has lived a life of privilege and reward for his hard work, this has not blurred his vision of the community and those less fortunate than he.  After he hired former inmates for moving and packing services, Spencer Dunkley said Mr. Tigani "treated every single individual with the utmost respect and courtesy," giving them "the idea that they could work and achieve a high level of success." 14/  Mr. Dunkley noted with appreciation that Mr. Tigani also "donated clothing and toys to the men and their families, knowing they were in need." 15/

Executive Director of St. Michael's School, Helen Riley, says that within weeks of a school tour in 2007, Mr. Tigani, troubled that students were not equipped "to master technology

---

10/    Exhibit 1:  Letter from Candace Tigani, former wife.
11/    Exhibit 5:  Letter from Dr. Howard Borin, pediatrician.
12/    Exhibit 1:  Letter from Candace Tigani, former wife.
13/    *Id.*
14/    Exhibit 7:  Letter from Spencer Dunkley, owner of Dunkley Discount Movers who Mr. Tigani hired.
15/    *Id.*

as an important 21st century skill," sent the school "all of the equipment needed to set up a state-

of-the-art technology center . . . [, allowing] our children to work simultaneously with their

teacher on computer skills." 16/  She emphasizes:

> This single act of kindness, fairness and generosity lifted the level of our tech program
> out of the dark ages and into the 21st century.  His visit was an amazing blessing for our
> children.  To his further credit, Mr. Tigani made this gift anonymously and though we
> offered to give him public recognition, he modestly declined.  17/

Through the past four years, Ms. Riley adds, "Mr. Tigani has continued to support our school

and the children of our neighborhood." 18/

On the personal level, Mr. Tigani guided a friend through a difficult divorce in an abusive

situation, "remind[ing her] of [her] own strengths.  He assisted me with a personal loan to be

able to relocate.  I can say without hesitation he saved our lives."  He knew my boys deserved

better because he is so completely dedicated to his own boys."  19/

### 4.  Service to Children, Community, and Charities

Brian DiSabatino, Chairman of the St. Francis Hospital Foundation, describes Mr. Tigani

as "a rare breed of 'doers' in our community" who has "repeatedly supported our mission to help

those in need of free healthcare. . . . [Mr. Tigani] understands that being blessed with talents, he

can use his position for the benefit of those less fortunate," " 20/

Mr. Tigani served five years as a Central YMCA volunteer coach in flag football and

soccer.  Even in the most difficult period of his life when Mr. Tigani was in trial over the family

---

16/     Exhibit 8:  Letter from Helen Riley, Executive Director of St. Michael's School for Boys.
17/     *Id*.
18/     *Id*.
19/     Exhibit 4:  Letter from Bridin Reynolds, friend.
20/     Exhibit 11:  Letter from Brian DiSabatino, Chairman of St. Francis Hospital Foundation.

business dissolution in 2010 and during the 2011 federal investigation and charges, Mr. Tigani continued coaching children.

Lara Munch, a team mother explains he was "one of the most encouraging and involved coaches that I have witnessed."  21/  She comments, "[m]y son, in particular, knew very little about the sport and was not a strong player, yet Chris took a special interest in fostering his enthusiasm and building his self confidence," which led her son to play an additional season. 22/ He "was successful in creating a unified and sportsman-like atmosphere throughout both seasons."  23/  She adds that after over 20 years of experience teaching, "I can honestly say that Chris has a special gift with all Ms. Munch's children, including his own." 24/  Team mother Kristin Hodgson said:  "I trust him with my most valued passion, our son, and he has proved a wonderful example." 25/  Frederick Dill, whose grandson played on his team and who became Mr. Tigani's assistant coach, said:

> [T]here are many children that benefit from Chris' coaching and guidance. . . . Chris is caring and has a genuine interest and the skill to influence and provide leadership to our youth.  By incarcerating Chris, our community and our youth would lose his unique talents and abilities. 26/

---

21/     Exhibit 13:  Letter from Lara Munch, friend and mother of team member Mr. Tigani coached.

22/     *Id*.

23/     *Id.*

24/     *Id*.

25/     Exhibit 15:  Letter from Kristin Hodgson, friend and mother of team member Mr. Tigani coached.

26/     Exhibit 12:  Letter from Frederick Dill, friend and fellow YMCA sports coach.

Robert Morgan recalls, "Without me asking, Chris offered to donate money to assist the wrestling team . . . far [exceeding] our expectations.  He . . . . also offered his own personal time.  He was willing to do anything he could to help the kids." 27/

At another school, Mr. Tigani helped establish a reading program for special education students, and "personally came to my classroom to celebrate their success.  He honored them with sincere praise; he donated Eagles Tickets for the top reader; and he gave each student a copy of his favorite book and a bookstore gift card." 28/

Mr. Tigani has embraced many other charities, such as years of programs for disadvantaged children and cultural events in Dallas,29/ the Delaware chapter of the Boy Scouts, 30/ and the Delaware Theatre Company fund raising board. 31/  He serves as swim team coordinator at his neighborhood pool, and always includes the other children in his activities with his own sons. 32/  Whether on a personal or community scale, Mr. Tigani's actions speak loudly of a dedication to neighbors and especially to children.

### 5.  Aid to Small Business in Community

Mr. Tigani has shown generosity and selflessness in assisting other small businesses. When Lawrence and Michele Gillen were business novices, Mr. Tigani discerned that other

---

27/      Exhibit 16:  Letter from Robert Morgan, friend and father of wrestling team member Mr. Tigani supported.
28/      Exhibit 17:  Letter from Michelle Gillen, friend and recipient of classroom help from Mr. Tigani.
29/      Exhibit 18:  Letter from Stephanie Downes, Dallas Cowboys
30/      Exhibit 19:  Letter from John Harris, friend and attorney.
31/      Exhibit 4:  Letter from Bridin Reynolds, friend.
32/      Exhibit 9:  Letter from Daniel Larnick, friend.

distributors were taking unfair advantage of them.  He " 'showed them the ropes' of this industry" and enabled them to make their business successful. 33/

Mr. Gordon explains that he "met Chris during the initial stage of entrepreneurship when my partner and I started a new car service business. . . . I noticed how kind he was." 34/ Mr. Tigani's support, "allowed me to continue and grow during a time of great economic struggle.  Chris never stopped believing in me." 35/

Gene Paulino received business help from Mr. Tigani:

Mr. Tigani has been very instrumental in the resurrection of my small business which supports several families.  After I fell under unfavorable circumstances, Mr. Tigani stepped in and offered a variety of support concerning both my business and personal life.  He has taken a sincere interest in the well-being of my family and myself.  He always seems to be there, for us, when we are in need.36/

Mr. Paulino finds it "incomprehensible to think that anyone could benefit from the incarceration of such a generous man with the sincerest interest in the welfare of others." 37/

**6.  Creation of New Business**

Mr. Tigani established a new beer and liquor distributorship, World Class Wholesale ("WCW"), in early 2011 before the criminal charges were filed.  Several loyal former NKS employees and his former wife are among the employees.  In just one year at WCW, Mr. Tigani has won the trust of nearly 30 suppliers and over 200 new customer accounts—all retailers in Delaware—and of his now-five employees and four independent contractors.  WCW has

---

33/    Exhibit 22:  Letter from Lawrence Gillen, friend and recipient of business help.
34/    Exhibit 23:  Letter from Corey Gordon, friend and recipient of business help.
35/    *Id.*
36/    Exhibit 24:  Letter from Gene Paulino, friend and recipient of business help.
37/    *Id.*

contributed significantly to Delaware's economy in the past year:  over $150,000 in wages and

1099 income; $15,000 in federal income, $6,000 in state income, and $500 in local income taxes

for employees; $13,000 in social security and Medicare taxes; $15,000 in excise taxes; $25,000

in excise taxes from WCW suppliers; and $20,000 in state liquor license fees.  The business grew

from $7,000 sales in May 2011, to almost $90,000 sales in January 2012.

WCW employee Mr. DiConsiglio states,

> I hope I can effectively communicate how detrimental any incarceration of Chris will be
> to the ongoing and future success of World Class Wholesale . . . . If Chris is taken away
> from us, the State of Delaware will have 3 or 4 more people who will be added to the
> long list of the unemployed and for me and my family that would be devastating. 38/

Twenty-year friend Mr. Methven, employed at WCW, emphasizes:

> I believe that society will not be served well with his incarceration but more with his
> continued service to his new business, of which all the employees, myself included, are
> reliant on.  Without his presence, I believe the business will collapse and we will all be
> without jobs. 39/

Ms. Tigani shares this fear.  "Chris is the leader of this company and he has a great

rapport with his employees, customers, and suppliers," she explains. 40/  "If Chris is not able to

work, I believe that the business will suffer tremendously and probably fail altogether." 41/

### 7.   Character and Qualities

Mr. Tigani is variously described as an "industrious, hardworking, charitable, family man

who is civic-minded" consistently generous toward "friends, family and strangers in need." 42/

---

38/     Exhibit 26:  Letter from Paul DiConsiglio, friend and employee.  This letter was written
before additional staff was brought on board.
39/     Exhibit 27:  Letter from Kent Methven, friend and employee.
40/     Exhibit 1:  Letter from Candace Tigani, former wife.
41/     *Id.*

Others say he is "one of the most caring people I've ever known.  Chris would help anyone and is eager to make sure those around him are happy." 43/  Another friend comments that,

> [others] say please wish him well and that they are praying for him every day . . . I could quote you chapter and verse of so many others that have told me that 'Chris did this for us when my wife was pregnant' or 'Chris did that for us when I had a problem at home.44/ . . . He would give you the shirt off his back.  He is always positive.  He is always helpful.45/

Another explains that, "Even when the dark clouds of adversity hovered around Mr. Tigani he continued to help others around him." 46/  Mr. Methven adds that "[t]hroughout the entire ordeal of lawsuits with his father, dismissal from his job and criminal proceedings, Chris never spoke ill of any individual involved.  I believe, knowing him intimately since he was a teenager, that he was sincere and never malicious." 47/

Step-brother Mr. Bernard attests, "Christopher has made some mistakes as many of us have but he has learned greatly from these mistakes . . . I strongly believe Chris is a man of high character and will never make these mistakes again." 48/  Another explains that Mr. Tigani shouldered a great deal of responsibility at an early age through his leadership at NKS and made errors in judgment.  He says, however, "I know that Chris is well-aware of his faults and bad decisions . . . His public humiliation has been life-changing;" "[h]e has expressed full responsibility and has taken ownership for his actions." 49/

---

42/    Exhibit 19:  Letter from John Harris, friend and attorney.
43/    Exhibit 21:  Letter from Amy Colbourn, friend.
44/    Exhibit 26:  Letter from Paul DiConsiglio, friend and employee.
45/    Exhibit 10:  Letter from Jill Abbott, friend.
46/    Exhibit 25:  Letter from Andrew Eckman, friend and recipient of business help.
47/    Exhibit 27:  Letter from Kent Methven, friend and employee.
48/    Exhibit 2:  Letter from Robert Scott Bernard, step-brother.
49/    Exhibit 9:  Letter from Daniel Larnick, friend.

Mr. DiSabatino says, "[Chris'] actions have shown me that he has grown keenly aware of the impact of his misdeeds and Chris has spent a significant amount of time addressing his personal issues in a very direct fashion." 50/ He has "sought support from those close to him as a way to change the direction of his life." 51/ And Mr. Tigani's former wife attests, "he has been a much better person and father . . . over the course of the past two years." 52/

Mr. Tigani deeply regrets his crimes. He is taking active steps to correct course and set the past right. Friend and attorney Anthony Clark for Mr. Tigani during proceedings with his father, explains:

> Chris has been sorely humbled by it, and learned much from, this terrible experience . . . particularly Chris's recognition that he largely brought this all upon himself, his children and his extended family. I have no doubt whatsoever that Chris will never again cross the line of the law or do anything that could even remotely bring disrepute to himself or the Tigani name in the future. 53/

Friend Mr. Harris also explains:

> These tragic mistakes, as I understand them, were not born out of greed or malice. I have no doubt that Chris is deeply remorseful for his actions—for which he has already suffered dearly. He has been the focus of constant—and I dare say, slanted—media attention over the past 12 months, causing serious—if not irreparable—damage to his reputation and family name. . . . For Chris, the shame he has brought on himself and family represents a grave punishment in itself.54/

Mr. Harris notes he is "particularly struck by Chris' sense of humility, reflection, level-headedness and commitment to taking personal responsibility for his grievous errors in

---

50/     Exhibit 11:  Letter from Brian DiSabatino, Chairman of St. Francis Hospital Foundation.
51/     *Id.*
52/     Exhibit 1:  Letter from Candace Tigani, former wife.
53/     Exhibit 29:  Letter from Anthony Clark, friend and former attorney for Mr. Tigani's former attorney.
54/     Exhibit 19:  Letter from John Harris, friend and attorney.

14

judgment."  He is confident that Mr. Tigani "will be a model citizen for the rest of his days." 55/

Mr. Tigani's father, with whom Mr. Tigani has restored his relationship, observes that

Mr. Tigani has turned his life around and now seems like the "old Chris."  He believes the

changed Mr. Tigani has much to offer the community and much to teach his sons. 56/

### B.  Factors that Reflect the Need for a Non-Custodial Sentence

The Court must consider the need for the sentence imposed, bearing in mind the purposes

of sentencing:  just punishment, adequate deterrence, incapacitation, and rehabilitation.

18 U.S.C. § 3553(a)(2)(A)-(D).  Incarceration would squander an opportunity for a just and

sufficient punishment by having Mr. Tigani serve the community in a non-custodial sentence of

supervision in either a half-way house or home confinement and significant community service,

with long probation.

### 1.  Societal Need for Productive Employers

Mr. Tigani is in no way a threat to society.  Though active in school activities, he "started

and ran his own business (Delaware Candies) at age 16 or 17 and sold it at a profit." 57/ Running

NKS as President at the age of 29, it grew to 120 employees.  Mr. Tigani "was respectful and

friendly to everyone from the VP down to the guy who swept the warehouse." 58/

The early strong performance of Mr. Tigani's new business enterprise shows his

particular gift in building a business and that WCW could become an employer of many more

Delawareans.  Indeed, Mr. Tigani is prepared to employ former inmates as they re-enter society.

---

55/     *Id.*
56/     Exhibit 28:  Letter from Robert Tigani, father.
57/     Exhibit 2:  Letter from Robert Scott Bernard, step-brother.
58/     *Id.*

WCW's current employees' livelihoods will be threatened if Mr. Tigani is imprisoned and unable to tend to the daily operations of the business.  The state of Delaware will also be deprived of the many other benefits that flow from a flourishing business through contracts, building and vehicle rentals, taxes of all varieties, and licensing fees.

This court should follow other courts that have varied downward from the Sentencing Guidelines to impose non-prison sentences for defendants with strong employment histories. The Third Circuit has repeatedly affirmed sentences of probation or house arrest for defendants with employment records comparable to Mr. Tigani's, allowing the defendant to continue working while serving his sentence, thereby allowing employees in the community to stay employed.  In *United States v. Tomko*, 562 F.3d 558, 563 (3d Cir. 2009), a Third Circuit en banc panel upheld a district court's decision to grant a defendant a downward variance to a sentence of probation because of the negative impact that incarceration could have on his company's employees.[59]  The court in *Tomko* noted that if the defendant went to jail, the company would be in "dire straits financially" and the jobs of the company's "innocent" employees would be threatened.[60]  Rather than risk the livelihood of innocent employees, Mr. Tigani prays for a sentence that allows him to support his family, his employees, and meet the restitution obligations of his sentence.  With today's high rate of unemployment, we respectfully request that this Court give extra consideration to Mr. Tigani's strong history of employment as part of its § 3553(a) analysis and decline to incarcerate him.

---

[59]    *See also United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (upholding a downward variance for the defendant's 20-year employment history with the Air Force); *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) (upholding a defendant's below-Guidelines sentence based in part on the factor of his "history of strong employment").

[60]    *Tomko*, 562 F.3d at 562.

16

### 2. A Just, Non-Custodial Sentence Will Take Into Consideration the Unsettled Law of Corporate Campaign Contributions

Mr. Tigani unequivocally admits to actions charged at Counts 1 and 2 of the information as federal crimes.  He acknowledges and takes full responsibility for seeking contributions from the employees of NKS and reimbursing them from NKS's accounts to circumvent the then-applicable rules prohibiting corporations from making campaign contributions.  But prosecutions for these very acts are now the subject of significant challenge in two separate Courts of Appeal 61/ since the Supreme Court announced the first amendment right of corporations to make independent political expenditures in *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010).  It will take time for the courts to render guidance on whether the laws forming the basis for this prosecution are valid under the First Amendment.  But until this happens, there is a significant question whether incarceration is a just sentence as contemplated and required by 18 U.S.C. § 3553(a)(2)(A).

The Court in *Citizens United* held that, "the First Amendment does not allow political speech restrictions based on a speaker's corporate identity" and thus, corporations cannot be banned from making the same independent expenditures as individuals.62/  Corporations, labor organizations, and political committees now may make unlimited independent expenditures 63/

---

61/    *United States v. Danielczyk*, 791 F. Supp. 2d 513 (E.D. Va. 2011), notice of appeal filed to 4th Cir. June 16, 2011); *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 640 F.3d 304 (8th Cir. 2011), reargued en banc (Sept. 21, 2011).

62/    *Citizens United*, 130 S. Ct. at 903.

63/    "Independent expenditures" is defined as an expenditure by a person that expressly advocates the election or defeat of a clearly-identified candidate, not at the request or suggestion of the candidate or political organization.  2 U.S.C. § 431(17).

from their own funds, and may pool unlimited funds into political action committees.64/ Applying the logic of *Citizens United*, NKS has, since its formation, had a First Amendment right to express its support for a specific candidate for elected federal or state office, and for specific liquor licensing laws that would benefit the company.  The Supreme Court has ruled, in effect, that Mr. Tigani, as President of NKS, should have had the opportunity to make independent expenditures for election campaigns using NKS's general treasury funds.  Instead of bundling employee contributions to circumvent campaign donations limits, Mr. Tigani could have caused NKS itself to make independent expenditures to create unlimited campaign ads, billboards, and other communications to support his candidate and cause of choice without the need to involve NKS employees.  Had he known of NKS's constitutional rights, Mr. Tigani could have used NKS's funds in a legitimate manner under the law.  While ignorance of the law is not a defense to criminal behavior, knowledge of the law in this instance would have afforded Mr. Tigani the opportunity to make different choices.  To incarcerate Mr. Tigani now for actions that might have been avoided had he known his company's rights as articulated in *Citizens United*, is not a just punishment.

Mr. Tigani respectfully requests that the Court consider that violations of 2 U.S.C. § 441(b)(a) are much less likely to occur as a result of the *Citizens United* and its progeny. Corporations and individuals have less incentive to violate § 441's contribution limits now that the Supreme Court has paved the way for unlimited political contributions using political action

---

64/     *See SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686 (D.C. Cir.) *cert. denied sub nom. Keating v. Fed. Election Comm'n*, 131 S. Ct. 553 (2010); FEC Advisory Opinion 2010-11, 3 n.3 (July 22, 2010), *available at* http://saos.nictusa.com/aodocs/AO%202010-11.pdf (last visited Feb. 21, 2012).

committees and independent expenditures.  Incarcerating Mr. Tigani for these crimes serves little deterrent value under § 3553(a), as these violations are likely to become obsolete.

Current case law is unsettled as to whether *Citizens United* invalidates the very federal statutes under which Mr. Tigani is now convicted.  Counts 1 and 2 of the information charge Mr. Tigani with violating § 441(b)(a) by, "knowingly and willingly . . . causing contributions funded by NKS . . . to a campaign committee for the Office of President of the United States." Information ¶¶ 24, 26.  When *Citizens United* struck down § 441's ban on independent corporate contributions, it also called into question by implication the constitutionality of the sections of § 441 under which Mr. Tigani is charged.

At least two federal appeals courts currently are deciding whether *Citizens United* renders § 441(b)(a) and other similar state bans on corporate donations unconstitutional.  In *Danielczyk*, Judge Cacheris in the District Court for the Eastern District of Virginia extended the reasoning of *Citizens United*, dismissing § 441(b)(a) charges against a defendant on the grounds that *Citizens United* now renders that provision unconstitutional. 65/  Judge Cacheris concluded that *Citizens United*:  "[L]eaves no logical room for an individual to be able to donate $2,500 to a campaign while a corporation . . . cannot donate a cent . . . . [T]he Government may not suppress political speech on the basis of the speaker's corporate identity.  Thus, following *Citizens United*, individuals and corporations must have equal rights to engage in *both* independent expenditures *and* direct contributions."66/

---

65/     Prosecution of other charges is currently stayed pending ruling by the 4th Circuit regarding dismissal of the § 441(b)(a) charge.
66/     *Id.*

The Eighth Circuit recently took a different view in *Minnesota Citizens*, where the Minnesota state law in issue permits independent corporate expenditures while banning direct campaign contributions.  The Circuit Court upheld the district court's denial of plaintiffs' request for a preliminary injunction and did not disturb the ban where it allowed for independent corporate expenditures so long as the expenditures are disclosed and limited.  The court said plaintiffs were not likely to prevail on the merits of their claim that such a ban violated *Citizens United*, 67/ even though it conceded that *Citizens United* seems to overrule the direct contribution ban by implication.68/  As of this writing, the Supreme Court issued a stay of the Montana Supreme Court's December ruling on its state law. 69/

*Danielcyzk* and *Minnesota Citizens* are only a sample of the federal and local challenges to corporate contribution bans post-*Citizens United*, demonstrating that the constitutionality of § 441(b)(a) and its corollary statutes is very much unsettled.  No doubt, many will seek further clarity from the Supreme Court.  But given the constitutional challenges, circuit splits, and rapid development of case law in this area, incarceration hardly is a just resolution for an individual in Mr. Tigani's position.

---

67/     The plaintiffs sought a hearing en banc; rehearing en banc was granted and the case was rescheduled for argument en banc on September 21, 2011.  A decision from the en banc panel has not yet been rendered.

68/     *See Minnesota Citizens*, 640 F.3d at 318.

69/     *See Am. Tradition P'ship, Inc. v. Bullock*, No. DA 11-0081 (U.S. filed Feb. 17, 2012), docket *available at* http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/11a762.htm (last visited Feb. 21, 2012).

### 3.   A Non-Custodial Sentence Avoids Unwarranted Sentence Disparities and Achieves Proportionality with Other Campaign Violation Offenders

We also respectfully submit that Mr. Tigani does not merit a jail sentence in view of sentences handed down against other defendants in corporate campaign contribution prosecutions.  Sentencing Mr. Tigani to jail time would create a sentencing disparity between him and other similarly situated defendants who engaged in comparable conduct.  Although a comprehensive record of all sentences in campaign finance cases is not available from the U.S. Sentencing Guideline's Statistics, representative samples of cases from this and other jurisdictions give guidance on how courts sentence defendants for campaign contribution reimbursement schemes. 70/  Filings in the District Court of Delaware available through the PACER system reveal that there has never been a defendant convicted under these campaign laws.  Filings in the Third Circuit available through PACER show that no court in the circuit has imposed a sentence of incarceration for the commission of only the conduct in Counts 1 and 2. 71/  In fact, PACER yielded only three Third Circuit cases in which the defendants were sentenced to jail for conduct involving illegal corporate campaign contributions, and their actions

---

70/     In lieu of U.S.S.G. statistics, the U.S. government recently compiled a representative list of conduit contribution cases and their dispositions in *United States v. Snapper,* No. 1:10-cr-00325-PLF, D.E. 17(D.D.C. filed June 21, 2011).  The government's statistics show a clear pattern of non-incarceration for this conduct.  In fact, only six cases on the government's list imposed jail sentences, all of which involved significantly more money and serious charges, as described *infra*.

71/     *See United States v. Alampi*, No. 2:99-cr-00722-AMW (D.N.J. filed Dec. 1, 1999) (imposing a fine, only, on October 13, 2000); *United States v. Cha-Kuek Koo*, No. 2:00-cr-00353-AMW (D.N.J. filed June 1, 2000) (imposing probation and fine, only, on Apr. 15, 2002); *United States v. Robert M. Feldman*, No. 2:09-cr-00075-SD (E.D. Pa. filed Feb. 5, 2009) (imposing fine, only, on June 12, 2009).

are easily distinguishable from Mr. Tigani's in kind and degree. 72/  In *United States v. McCrosson*, the defendant pled guilty to both wire fraud and conversion of contributions to a federal candidate relating to a scheme where the defendant, a congressional campaign treasurer, converted $458,000 for personal use over a period of approximately 15 years.  *McCrosson* far exceeds the dollar amount and scope of Mr. Tigani's conduct.  *United States v. Vas* involved Vas, a mayor and state assemblyman, and Ramos, Vas's aide and campaign treasurer.  Both were convicted of scheming to finance Vas's congressional campaign with funds raised by selling properties rehabilitated with public funds.  Mr. Tigani never abused public or campaign funds like the campaign contribution violators incarcerated in this Circuit.

Beyond the Third Circuit, defendants sentenced for conduct similar to Mr. Tigani's overwhelmingly receive probationary sentences, which often include community or home detention, community service and fines. 73/  The few jailed defendants committed more serious and complex offenses.  In *United States v. Paul Magliochetti*, No. 10-cr-00286 (E.D. Va. 2010)*, the defendant, the founder of a prestigious Washington lobbying firm and former aide on the House Appropriations Subcommittee on Defense, pled guilty to a scheme involving almost $400,000 in illegal conduit campaign contributions over a five-year period.  In *United States v. Wade***, No. 06cr0049 (D.D.C. 2006), the defendant's scheme included bribery under the Travel Act and conspiracy.  In *United States v. Noe,* No. 05cr796 (N.D. Oh. 2006), the defendant was a prominent county party official and registered fund-raiser who failed to accept responsibility and

---

72/ These cases include:  *United States v. Vas*, No. 2:09-cr-00370-SDW, 2010 WL 3169293 (D. N.J. Aug. 10, 2010), *United States v. McCrosson*, No. 1:11-cr-00137-JEI (D.N.J. filed Sept. 7, 2011), and *United States v. Chang*, No. 2:00-cr-00358-AMW (D.N.J. filed June 2, 2000).
73/ *See United States v. Snapper,* No. 1:10-cr-00325-PLF, D.E. 17(D.D.C. filed June 21, 2011).

committed obstruction in the course of the investigation.  In contrast, Mr. Tigani accepted

responsibility for his improper actions and cooperated with investigators immediately.  The

defendants in *United States v. Alford*, No. 05cr0069 (N.D. Fla. 2005) owed over $12 million in

restitution, and in *United States v. DeLoach*, No. 06cr20583 (S.D. Fla. 2006), the defendants

participated in a massive $36 million embezzlement scheme in addition to conduit campaign

violations.  In *United States v. Hildebrant*, No. 05cr0002 (S.D. Ohio 2005), the defendant

fraudulently obtained multiple millions of dollars from several banks, owing a combined

restitution of over $4 million.  Overall, the government's statistics on campaign finance

sentencing reflect that jail time has been reserved principally for defendants implicated in broad,

egregious, and pervasive criminal conduct, and not for a cooperating, first-time offender like Mr.

Tigani.

In sum, sentencing Mr. Tigani to incarceration for these crimes would be unfair,

unprecedented, and in contradiction to § 3553(a)(6)'s stated goal of avoiding "unwarranted

sentenc[ing] disparities among defendants with similar records who have been found guilty of

similar conduct[.]"  Thus, we respectfully ask the Court to impose a sentence for Mr. Tigani of

community supervision instead of jail time.

### 4.  A Non-Custodial Sentence Avoids Unwarranted Sentence Disparities and Achieves Proportionality with Sentences for Other Tax Offenders

A supervisory sentence for Mr. Tigani's tax violations in Counts 3 and 4 is appropriate to

avoid disparity with other defendants sentenced for similar conduct.  A search of PACER

statistics reveals that your Honor has sentenced defendants charged with violating 26 U.S.C.

§ 7206(1) to serve probation in cases with single or multiple counts of tax fraud. 74/  Mr. Tigani admits that these are not his only crimes, but finds the sentences in those cases instructive when considering his own case.

For example, like Mr. Tigani, the defendant in *Sultan* was a first-time offender, primary income-earner for his young family of four, and a business-owner.  He was sentenced to three years of probation and a six-month period of home detention with electronic monitoring instead of jail time.  The purpose of varying from a term of imprisonment to probation that this Court articulated was the same as Mr. Tigani suggests—that he be allowed to continue to work, pay back his restitution, and care for his family.  In *Glover,* the defendant, like Mr. Tigani, was the operator of a multiple-generation family business with employees that depended on the business for their livelihood.  Again like Mr. Tigani, the defendant cooperated with the government, filed amended tax returns, paid the government restitution, and was sentenced to 18 months of probation.

It is appropriate for this Court to consider Mr. Tigani's restitution efforts in deciding a fair sentence for his conduct.  Even under the more stringent sentencing guidelines that predated *Booker*, this Circuit has held that restitution efforts may be grounds to warrant a downward departure.75/  In this case, Mr. Tigani made immediate efforts to cooperate with the government and already has made sizeable payments to the IRS.  Incarcerating Mr. Tigani at this point will

---

74/      *See United States v. Glover*, No. 1:08-cr-00033-GMS (D. Del. filed Mar. 3, 2008); *United States v. Sultan*, No. 1:04-cr-00052-GMS (D. Del. filed May 6, 2004); *United States v. Spinella*, No. 1:04-cr-00112-GMS (D. Del. filed Oct. 18, 2004).

75/      *See United States v. Lieberman*, 971 F.2d 989, 996 (3d Cir. 1992); *see also United States v. Severino*, 454 F.3d 206, 211 (3d Cir.2006) (concluding that district courts still have the authority to consider extraordinary acceptance of responsibility post-*Booker*).

be counterproductive to his ability to pay the off the remaining balance and create an unnecessary sentencing disparity between him and similarly situated defendants who have appeared before this Honorable Court.

**5. A Significant Term of Community Service Would Promote Justice and Serve the Interests of the Community**

Mr. Tigani respectfully asks the Court to sentence him to supervision and community service programs near his home as an alternative to incarceration, consistent with a just and fair sentence under § 3553(a). Mr. Tigani stands ready to employ inmates at his new business as its staffing needs grow. His skills, insights, and experience make him uniquely suited to assist other prisoners with writing resumes, finding job training, learning interview skills, and other services they will need upon release from prison and re-entry into society. For these reasons, he is committed to assisting the court, its probation department, the U.S. Attorney's office, and the Federal Public Defender with the implementation of its re-entry court program for federal prisoners. The factor which makes such a program successful is the pool of volunteers with sufficient talent and personal resources to work with individual former inmates and find ways in which they can succeed in the world of employment—the single most important factor in avoiding recidivism. Seeing the example Mr. Dunkley set for his employees, Mr. Tigani is ready to perform that role as employer. But beyond that, Mr. Tigani is ready to serve as career and employment counselor and mentor for those whose most significant challenge is finding a way to support themselves and families after a long period of unemployment while overcoming the stigma of incarceration. He understands fundamentally that an adult needs meaningful work in order to overcome past problems and keep moving forward in a lawful and productive way. So

Mr. Tigani prays for the opportunity to assist the court while serving a supervised sentence of half-way house or home confinement, electronic monitoring, followed by lengthy probation.  His aid to those starting new businesses shows his skills are especially suited to work with this project.  Should the Court find that program is not yet ready for his services, Mr. Tigani is prepared to perform other community service and to work tirelessly in that assignment for as long as the Court deems appropriate.

## IV. CONCLUSION

Whether a man is remorseful or rehabilitated can only be assessed by his actions after he commits wrongs.  Mr. Tigani's conduct since his illegal activity reveals a deep understanding of and regret for the wrongs he committed.  His acts also reflect a fundamental belief that when he takes responsibility, he can repay his debts and build a future for his family and the betterment of his community.  He prays that this court's sentence will allow him to do that.


Dated:  February 21, 2012                         Respectfully submitted,



                                                  Virginia A. Gibson (Del. Bar No. 3699)
                                                  HOGAN LOVELLS US LLP
                                                  1835 Market Street, 29th Floor
                                                  Philadelphia, PA  19103
                                                  (267) 675-4600
                                                  Virginia.Gibson@hoganlovells.com
                                                  *Attorney for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the forgoing was sent via electronic mail and first class

mail to the following counsel of record this 21st day of February, 2012:


Mr. Walter P. Matthews
Senior U.S. Probation Officer
United States Office of Probation and Pretrial Services
United States District Court
J. Caleb Boggs Federal Building, Unit #39
844 King Street
Wilmington, DE 19081

Mr. Robert F. Kravetz
Assistant United States Attorney
U.S. Department of Justice
U.S. Attorney's Office
District of Delaware
Nemours Building
1007 N. Orange St., Suite 700
P.O. Box 2046
Wilmington, DE 19899-2046

Virginia A. Gibson