# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Cr. A. No. 11-42-GMS |
| | ) | |
| CHRISTOPHER TIGANI, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

NOW COMES the United States of America, by and through its attorneys, David C. Weiss, Attorney for the United States, Acting Under Authority Conferred By 28 U.S.C. § 515, and Robert F. Kravetz, Assistant United States Attorney, and files the following in response to the sentencing memorandum (D.I. 23) of defendant Christopher Tigani ("Tigani" or "defendant").

Defendant claims in his Sentencing Memorandum that his criminal conduct was an "error in judgment" and an "aberration in an otherwise productive, law-abiding life." Def.'s Sent. Mem. at 1. That argument ignores reality, and, in the process, substantially minimizes his offenses.

From 2003 until 2008, defendant engaged in pervasive criminal conduct through his business, NKS Distributors, Inc. ("NKS"). On multiple occasions over a six-year period, defendant made illegal campaign contributions and other donations through NKS in an attempt to influence the political process, rationalizing that his illegal conduct was just another example of the "Delaware Way," and that, like others, he was entitled to receive political favors for his business and his industry. In so doing, he placed NKS and numerous employees at risk of criminal prosecution by using them as pawns to make illegal contributions.

1

Along the way, defendant's arrogance and greed led him to nearly drive his family-owned business to the brink of financial ruin. He used creative accounting to siphon funds from the business in an effort to support his extravagant spending – including purchasing an interest in a private jet and a mansion that he could not afford. When defendant's continued control of NKS was threatened, he resorted to such tactics as hacking into his father's personal email account, and accessing the email accounts of other employees he believed may be aligned against him.

As set forth below, the government agrees that a sentencing variance is appropriate to account for defendant's efforts to assist the government in the investigation of other public corruption offenses. Yet, the government disagrees strongly with defendant's request that he not be incarcerated. Defendant's failure to pay his taxes and his systematic violation of campaign finance laws demand jail time. A term of imprisonment will not only punish defendant for his actions, but will send a powerful message to the community that the wealthy and politically connected are not immune from criminal punishment – particularly when such traits factor significantly in their criminal conduct.

For all of these reasons, and those set forth below, the government respectfully requests the Court to impose a term of imprisonment of 25 months.

### Background

Defendant himself best described the pervasive nature of his conduct to federal agents. Over a six-year period, defendant became the embodiment of the "Delaware Way," a concept described uniformly by defendant and others as a form of soft corruption, intersecting business and political interests, which has existed in this State for years. Chris Tigani believed that buying into the "Delaware Way" would help him gain access to political figures and shield NKS from government

2

regulation. This belief led defendant to make over $200,000.00 in illegal campaign contributions to federal and state elected officials, candidates, and political parties. Defendant explained that he would not have received political support in matters of importance to him and his business without contributing large sums to political campaigns and providing politicians with other benefits, such as free alcohol. He subscribed to the philosophy that the "cumulative effect" of his constant support for politicians through campaign contributions over time would translate into legislative and other support for him and his business interests.

What follows below is how defendant described his conduct to federal agents, as well as other facts learned during the course of the investigation.

## I.      Defendant Gains Control of NKS and Becomes Politically Active

Defendant undertook day-to-day control of his family business, NKS, in 2000, from his father, Bob. NKS, formed by defendant's grandfather in 1949, is the exclusive distributor for Anheuser Busch/In-Bev products in Delaware. Defendant explained that, as part of a regulated industry, Anheuser-Busch encouraged distributors to become politically active in areas of importance. To that end, as the *de facto* head of NKS, Tigani became more active politically on several fronts, including lobbying on behalf of his company and the Delaware Wholesaler's Association and making political contributions and providing gifts to various candidates and campaign committees.

Two particular legislative issues were of great importance to NKS and the industry: lifting restrictions on Sunday sales of alcohol and deterring the State from enacting higher alcohol excise taxes. In May 2003, the Delaware legislature enacted the Sunday sales law. (74 Del. Laws c. 237). The bill was passed as the result of a heavy lobbying effort by defendant and the rest of the alcoholic

beverage industry. But its passage was not much of a surprise. Tigani told federal agents that the vote was a foregone conclusion, and that one prominent lobbyist informed him of the specific vote total prior to any votes being cast.

That same year, Tigani contributed to multiple candidates who had supported the Sunday sales law, including his illegal bundling of $16,800.00 in contributions to a Delaware gubernatorial candidate. See Presentence Investigation Report ("PSR") ¶ 25. In July 2004, the Delaware legislature removed a two-year "sunset provision" contained within the law, making the Sunday sales law permanent. The next month, Tigani bundled $50,000.00 in illegal contributions to a Statewide political party (for which he reimbursed himself and four other employees) just prior to a closely-contested gubernatorial election. Id.

Defendant denied the notion of any quid pro quo[1] with respect to the politicians' support and/or vote on the Sunday sales legislation, but he acknowledged that there was a clear expectation that he would support those individuals following its enactment and the subsequent removal of the "sunset provision." Tigani explained that this was the best example of the "Delaware Way" -- that politicians expected NKS to provide them with campaign contributions and other benefits after they took action that supported NKS.[2]

_____

[1]Tigani recalled that one former Delaware Representative solicited him for "booze and concert tickets" in exchange for his vote, which Tigani declined. Defendant acknowledged that he and NKS provided concert tickets, sports tickets, and free alcohol to various politicians, but denied that such gifts were attempts to influence specific pieces of legislation.

[2]Defendant described other benefits he received from his relationship with politicians. In 2004 or 2005, he requested that his father receive the lowest Delaware license number possible for a Vespa scooter. After speaking with the governor's office, a DelDOT director contacted defendant and told him to stop by and pick up a two-digit license plate (for which defendant paid the normal DMV processing fee). In addition, defendant was appointed to at least two positions with the State of Delaware, including the State Pharmacy Board and an Economic Development

Defendant told investigators that his financial support of politicians who voted for the Sunday sales law resulted in the political community (including candidates of both parties) viewing NKS as a "money machine."  To that extent, statewide candidates who otherwise did not have a connection to the Sunday sales law began soliciting Tigani heavily for contributions.  This prompted Tigani to budget at least $60,000.00 annually to reimburse NKS employees for political contributions they were directed to make.

At around the same time, the governor's office began searching for state-owned land on which Tigani could build a new warehouse for NKS in Southern Delaware.  After identifying two parcels of land owned by the Delaware Department of Transportation (DelDOT) in Milford, the governor's office directed the Delaware Economic Development Office (DEDO) to arrange for the property to be sold to NKS for fair market value.[3]  Ultimately, DelDOT determined that it could not sell the property to defendant because the land had been acquired initially by the federal government in accordance with a future highway transportation project.  Thus, DelDOT's only option was to enter into a lease with defendant for the property.

The lease option, however, was met with resistance by an adjacent property owner, who claimed that he had wanted to purchase the two parcels from DelDOT for years.  That property owner threatened to hold up the transaction.  Over the next 18 months, DelDOT, DEDO, and the governor's office engaged in continuing discussions to placate the adjacent landowner, so that the

---

position.

[3]In an email in November 2004, a DEDO employee wrote to an employee of DelDOT and the Budget Office that DEDO had "initiated dialogue to include the New Wharf Rd. location for NKS with the Budget Office in the mini-capital bill this winter," and that "the indication is that disposal of the property to NKS can go forward."

deal could move forward.[4]  Ultimately, in March 2006, the State decided to sell a small parcel of

state-owned land to the landowner for $1, with the restriction that the land remain in its natural,

wooded state.  Two months later, in May 2006, the State entered into a 66-year lease of the two

parcels with NKS, with an initial lease rate of $1,500.00 per month.

Defendant denied that he paid any bribes or gratuities to obtain the lease, and noted that NKS

paid a fair market value for the lease.[5]  Yet, he acknowledged that his relationship with State elected

officials paved the way for the deal to be consummated, and that NKS would not have received such

a "good deal" without his political influence.  In August 2006, three months after DelDOT leased

the property to NKS, defendant and another NKS employee made contributions in the total amount

of $17,500.00 to a national Governor's Association, for which they were reimbursed by NKS.[6]

---

[4]In an email dated July 12, 2005, the governor's chief of staff emailed a DelDOT
employee, "[P]lease let me know if I need to get involved in this project again.  Based on recent
history, please do not involve the Secretary in this and let's try to get this wrapped up ASAP."

[5]The NKS land and adjacent parcel became much more valuable, however, three years
later when DelDOT issued a corrective deed to the adjacent landowner, permitting the landowner
to build an access road off of SR1 and to develop the property outside of earlier restrictions on
the property.

[6]It was this same belief in perceived influence that led defendant to hedge his bets and
support both major candidates in a primary battle for Governor in 2008.  As set forth in the PSR,
defendant contributed $21,600.00 in NKS funds through conduit employee contributions in 2007
and 2008.  He also contributed $3,000 in conduit contributions in 2008 to a candidate for the
office of Lieutenant Governor.  The Lieutenant Governor candidate later requested to amend his
campaign finance report to reflect that he had received at least two cases of beer from NKS for a
fundraising event in 2007.  See "How Chris Tigani Seduced the Delaware Legislature," THE
NEWS JOURNAL (July 31, 2011).

Another focus for defendant and the alcoholic beverage industry was to avoid an increase in Delaware's alcohol excise taxes.[7] The Delaware Legislature enacted the most recent version of the alcohol excise tax ($4.85 per barrel on beer imports) in June 1990 (67 Del. Laws. c. 258). See Ex. 6. The restaurant and alcohol industry lobbied successfully against any increase in alcohol excise taxes in Delaware through the period of Tigani's campaign contributions. In fact, although the Delaware General Assembly increased other excise taxes on items such as cigarettes, the excise tax amount for beer imports remained the same. See 4 Del. C. § 581. In 2008, the Delaware State legislature voted down a proposed increase in the alcohol excise tax, with defendant cited as a key reason why the bill was defeated. See "Lawmakers Give Up on Delaware Hospital Tax," THE ASSOCIATED PRESS (July 1, 2008) (Available at: http://www.wboc.com/story/8583168/lawmakers-give-up-on-delaware-hospital-tax?clienttype=printable&redirected=true) (Accessed February 27, 2012). The next year, the legislature voted down another bill that would have raised taxes on alcoholic beverages. See http://legis.delaware.gov/LIS/LIS145.nsf/vwLegislation/HB+212?Opendocument (Accessed February 27, 2012).[8]

Defendant hoped that the influence he garnered with state politicians could be translated to the federal level. To that end, he agreed to become a high-level fundraiser for a Candidate for the Office of President of the United States (the "Candidate"). In this role, defendant participated in

---

[7]Under Delaware law, all alcoholic liquors purchased and received from a manufacturer or imported into Delaware are subject to the excise tax imposed by the Liquor Control Act when at rest in the State. Taxes are levied on a gallon or barrel basis, with rates varying according to the category of alcoholic beverage.

[8]The legislature did enact a law that raised the biannual fee charged to restaurants, liquor stores, and bars to sell alcohol, and levied additional fees on such entities operating on Sundays. See Ex. 6; http://legis.delaware.gov/lis/lis145.nsf/vwLegislation/HB+210?Opendocument (Accessed February 27, 2012). That law affected NKS customers, but not the company directly.

multiple finance conference calls with other fundraisers across the country. Ultimately, defendant illegally contributed $72,700 to the Candidate's campaign in 2007, reimbursing NKS funds to employees who acted as conduit contributors. See PSR ¶¶ 16-23. In an email on August 29, 2008, to the President of Anheuser Busch, defendant bragged about his alleged relationship with the Candidate, stating, "I was the number one fundraiser for [the Candidate's] Bid and will play a role in his new campaign as well as his son's role as a future Senator. They are very good and close friends and I know that we can take advantage of that relationship as needed." Tigani later explained to agents that he made these political contributions in an effort to gain access, but that he never actually received such access or sought to take advantage of the relationship.

## II.    Defendant Siphons NKS Funds to Commit Tax Offenses

During the same time period in which defendant was using NKS funds for political contributions, he also began to take money out of the company for personal use. As set forth in defendant's plea agreement and PSR, defendant's tax offenses involved artificially inflating his officer's loan account at NKS. The officer's loan account is a tool that may be used legitimately by closely-held businesses for tax purposes. Businesses employing the strategy provide officers with a year-end bonus from the company that is taxed. Oftentimes, the officers will loan all or a portion of that taxed amount back to the company, with the ability to earn interest income. If an officer receives a non-payroll disbursement from the company, or the company pays an expense on the officer's behalf, the amount that the company owes the officer is reduced by a corresponding sum.

That is how it is supposed to work in practice. In defendant's case, he directed NKS's Controller to enlarge his officer's loan account – in effect to inflate artificially the amount of money that NKS owed him in the account. Thus, it appeared as if defendant had loaned the company a

8

substantial amount of money when, in actuality, he never made corresponding contributions. This permitted defendant in 2005 and 2006 to take approximately $1,040,866.00 out of the company, tax free, for a total tax loss to the United States of $361,426.00.

Defendant used this money to spend well beyond his means. For the two years that are the subject of defendant's tax offenses, he purchased an interest in a Lear Jet that was owned by a prominent Delaware businessman. He also used NKS funds to purchase a $125,000.00 interest in a building in Dover with that same individual, as well as a $75,000.00 interest in a restaurant business with a family member. Defendant further placed a $74,000.00 deposit on a condominium in New York City, and used $33,000.00 for a property rental on Nantucket Island. In addition, NKS paid approximately $39,600.00 for personal landscaping at defendant's residence.

Defendant's extravagant spending continued, even outside of the two years charged in the Information. For example, in 2008, defendant purchased a mansion on a 4.5 acre tract in the Westover Hills section of Wilmington for $5.95 million. See PSR ¶ 78.[9] The net result of defendant's personal spending led to a very public battle between defendant and his father over control of NKS due to defendant's alleged misuse of company funds. Defendant's father eventually regained control of the company, at a time in which NKS had been unable to make timely payments to its lenders under existing banking lines of credit. Ultimately, the dispute between defendant and his father spawned a series of lawsuits that played out in the public forum. During this time period, in which the future of NKS was very much in doubt, defendant continued to shine the spotlight on himself. See, e.g., Ex.1, "The Trials of Chris Tigani,"

---

[9]On January 11, 2011, the property was sold in foreclosure for $2.1 million – a significant loss for the property's lender, which had financed the property in the form of a one-year interest-only loan.

http://www.delawaretoday.com/core/pagetools.php?pageid=8791&url=%2FDelaware-Today%2F

January-2011%2FThe-Trials-of-Chris-Tigani%2F&mode=print (Accessed February 26, 2012).

**III.    Defendant's Other Criminal Conduct During the Period in the Information**

The Presentence Report details other criminal conduct committed by defendant during the

period of the Information.

In 2007, believing that a former employee was receiving kickbacks from a liquor company

for pushing a particular type of tequila, defendant obtained the employee's social security number.

He then ordered NKS's IT manager to capture the employee's password using a keystroke program,

see Ex. 2, which defendant used to hack into the employee's investment account. See Ex. 3 at 68-69,

Ex. 4 at 2615-17. Regardless of defendant's motives for accessing the account, such conduct, which

he freely admitted to in testimony in the Delaware Court of Chancery, constitutes identity theft (in

violation of 18 U.S.C. § 1028(a)(7)), and illegal computer intrusion (in violation of 18 U.S.C. §

1030(a)(2)(c)).

In addition, defendant used computer programs to obtain access to the passwords used by

everyone in the NKS computer system, including his father. See Ex. 4 at 2607; Ex. 5. Defendant

used this information to spy on individual employees' business emails, as well as their PST files (a

feature of Microsoft Outlook that permits individuals to save emails to a separate server in order to

save disk space on the email server). See Ex. 3 at 48-51; 66-69; Ex. 4 at 2607-10. He further

admitted to hacking into his father's personal AOL account to read his father's emails during the

period of their dispute. See Ex. 3 at 51-53; Ex. 4 at 2607-08. Such action clearly violates §

1030(a)(2)(c). See United States v. Mendte, Crim. No. 08-CR-417-MAM (charging a former news

anchor with violating § 1030(a)(2)(c) for hacking into a co-anchor's personal email account).

## Sentencing Analysis

### I.      Standard

In accordance with the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220

(2005), the Third Circuit has mandated district courts to follow a three-step process in sentencing

criminal defendants:

> A district court must begin the process by first calculating the applicable Guidelines
> range. After that initial calculation, the court must then rule on any motions for
> departure and, if a motion is granted, state how the departure affects the Guidelines
> calculation. Finally, after allowing the parties an opportunity for argument, the court
> must consider all of the § 3553(a) factors and determine the appropriate sentence to
> impose, which may vary from the sentencing range called for by the Guidelines.

*United States v. Levinson*, 543 F.3d 190, 194-95 (3d Cir. 2009).

### II.     The Probation Officer Calculated the Applicable Guidelines Range Correctly

In this case, there is one remaining dispute regarding the applicable Guidelines range.

Defendant has objected to the Probation Office's determination that his offenses are not subject to

grouping rules under U.S.S.G. § 3D1.2. The net result is that defendant received a two-level increase

in his Guidelines range pursuant to U.S.S.G. § 3D1.4. <u>See</u> PSR ¶¶ 64-69. Without any citation to

supporting precedent, defendant contends that this determination was in error, and that his offenses

should be grouped under § 3D1.2(a) and (b) because "the same federal government was affected by

11

the false filings he caused." Def's Sent. Mem. at 4.[10]  Defendant is wrong, and the Court should

deny his objection.

"[C]ounts that are grouped together are treated as constituting a single offense for purposes

of the Guidelines." U.S.S.G. Ch. 3 Pt. D, intro. comments.  To that end, § 3D1.2 provides that the

grouping of offenses applies only to counts that "involve substantially the same harm." U.S.S.G. §

3D1.2.  Thus, "counts may be grouped by the court only when they meet the specific requirements

listed in U.S.S.G. § 3D1.2." United States v. Rudolph, 137 F.3d 173, 179 (3d Cir. 1998).

For offenses to be grouped under either subsections (a) or (b), the offenses must involve the

same "victim."  The Guidelines commentary provides that in "offenses in which there are no

identifiable victims (e.g., drug or immigration offenses, where society at large is the victim), the

'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed." U.S.S.G. §

_____

[10] Those subsections provide the following:

§ 3D1.2        Groups of Closely Related Counts

All counts involving substantially the same harm shall be grouped together into a
single Group.  Counts involve substantially the same harm within the meaning of
this rule:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions
connected by a common criminal objective or constituting part of a common
scheme or plan.

        *                *                *                *

U.S.S.G. § 3D1.2.

12

3D1.2, app. note 2.[11]  Using those examples of different societal harms, the commentary explains that "where one count involves the sale of controlled substances and the other involves an immigration violation, the counts are not grouped because different societal interests are harmed." Id.  Similarly, in this case two discrete societal interests were harmed by defendant's separate offenses – the societal interest in the integrity of the electoral process, and the societal interest in ensuring that citizens pay taxes on income to the United States Treasury.  Such offenses do not involve the same "victim" because they clearly do not "involv[e] substantially the same harm." Id. (noting that ambiguities are resolved in favor of grouping offenses "involving substantially the same harm").  Accordingly, neither subsection (a) nor (b) applies because the election offenses and tax offenses do not involve the "same victim," and the offenses may not be grouped together under § 3D1.2.

Even if the Court concludes that the offenses involved the "same victim," subsection (a) is inapplicable because the offenses do not involve the "same act or transaction."  The Guidelines commentary explains that subsection (a) applies when counts "represent essentially a *single injury or are part of a single criminal episode or transaction* involving the same victim." Id., app. note 3 (emphasis added).  The subsection is designed to capture conduct involving the violation of a general prohibition, as well as a specific prohibition encompassed in the general prohibition.  Id.  Examples include a conviction for kidnaping and assaulting the victim during the course of the kidnaping, bid rigging and mail fraud for signing and mailing a false statement that the bid at issue was competitive, and attempting to smuggle three illegal aliens into the country on the same occasion.  Id.  If the

_____

[11]The "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993).

offenses involve discrete acts, or conduct that occurred on separate dates – for example, two counts of assaulting a federal officer for shooting at the officer on two separate days – the Guideline is inapplicable. Id. Here, defendant's conduct was not part of a single criminal episode or transaction. The tax offenses to which he pleaded guilty occurred in tax years 2005 and 2006. The federal elections offenses occurred in 2004, 2006, and 2007, respectively. Because each of these discrete offenses constituted separate acts, § 3D1.2(a) does not apply.

Moreover, subsection (b) is inapplicable. The Guidelines commentary explains that subsection (b) applies to "counts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim[.]" Id., app. note 4. Where there is no common thread between the charged offenses, the subsection does not apply. For example, in United States v. Rzeplinski, 278 Fed. Appx. 156 (3d Cir. 2008) (not precedential), the defendant, a GSA program director, pleaded guilty to conspiracy to defraud the United States by providing government contracts to himself and a co-conspirator for which no work was actually performed. The defendant also pleaded guilty to tax evasion because, during the same time period, the defendant failed to file income taxes in order to shield his true income and avoid paying additional alimony. The defendant argued that the offenses should be grouped together under § 3D1.2(b) for purposes of sentencing because they involved substantially the same harm and motive. The Court of Appeals disagreed, finding that the offenses were not significantly related:

> Put simply, [the defendant's] fraud against the Army was not significantly related to his efforts to cheat his estranged wife of alimony by hiding his true income. Although his admitted objective in committing both crimes was to enrich himself, that means very little since greed motivates a variety of crimes. As we stated in United States v. Bush, when considering whether to group counts, courts must remember that "each crime has its own nuances and must be evaluated on its own." 56 F.3d 536, 539 (3d Cir. 1995)

14

<u>Id</u>. at 159.

The Court should apply the same reasoning in this case, as there was no common link between the two offenses. Defendant's tax offenses were not a product of his decision to take an improper business deduction for illegal political contributions. Nor did defendant use the artificial accounting maneuvers to inflate his officer's loan account in order to shield the true source of NKS funds used to make the contributions. Rather, defendant committed the elections offenses to gain political influence, and the tax offenses to bolster his income and to hide the money he was taking out of NKS from his father.

Accordingly, defendant's separate offenses, committed over a lengthy time period, should not be grouped together under § 3D1.2(a) or (b). To do so would be contrary to the grouping rules set forth under the Guidelines, and would permit defendant to avoid responsibility for the totality of his distinct offenses. <u>See</u> <u>United States v. Vitale</u>, 159 F.3d 810, 814 (3d Cir. 1998) (stating that tax evasion is a separate offense from wire fraud, and that if the two offenses were incorrectly grouped together "there would be no accounting for the fact that [the defendant] had evaded taxes, and in effect his conviction on that count would be washed away").

15

### III.   A Sentence of 25 Months Imprisonment Satisfies the § 3553(a) Sentencing Factors[12]

#### A.   A Prison Sentence is Necessary to Punish Defendant for His Serious Conduct

Federal campaign finance laws are designed to prevent corruption, as well as the appearance

of corruption, in federal elections.  In <u>Buckley v. Valeo</u>, the United States Supreme Court upheld

direct contribution limits against a First Amendment challenge, stating that:

> To the extent that large contributions are given to secure a political quid pro quo
> from current and potential office holders, the integrity of our system of representative
> democracy is undermined. . . .
>
> Of almost equal concern as the danger of actual quid pro quo arrangements is the
> impact of the appearance of corruption stemming from public awareness of the
> opportunities for abuse inherent in a regime of large individual financial
> contributions. . . .
>
> Congress could legitimately conclude that the avoidance of the appearance of
> improper influence "is also critical . . . if confidence in the system of representative
> Government is not to be eroded to a disastrous extent." . . . .
>
> Congress was surely entitled to conclude that disclosure was only a partial measure,
> and that contribution ceilings were a necessary legislative concomitant to deal with
> the reality or appearance of corruption inherent in a system permitting unlimited
> financial contributions, even when the identities of the contributors and the amounts
> of their contributions are fully disclosed.

424 U.S. 1, 26-28 (1976) (internal citations omitted).

This case exemplifies the need for campaign finance limits, and the important interests

implicated when they are abused.  Whether defendant successfully exercised any actual improper

influence with respect to any political candidates or not, the appearance of corruption remains –

primarily because defendant appears to have received everything he wanted from the political

---

[12]     Neither party filed a formal departure motion.  Thus, the sole determination for
the Court after resolving the Guidelines dispute is to determine the appropriate sentence after
considering the relevant § 3553(a) sentencing factors.

establishment. Defendant is responsible for creating such an appearance. He sought to peddle his influence not just during one election cycle, but during multiple election cycles over more than six years, at the local, State, and Federal levels. On each occasion, he placed NKS and its employees at risk of criminal prosecution. And his actions impacted all of those political candidates to whom he contributed, even those completely unaware of his illegal conduct. His conduct represents a staggeringly pervasive abuse of the political system.

But defendant's conduct was not confined to election offenses. He also devised a scheme that defrauded the federal government of $361,426.00 in tax revenues. Like election offenses, tax laws serve the important government interest of requiring everyone to pay his or her own fair share to the United States Treasury. Most tax offenses committed by a business owner involve pocketing business revenues without paying all, or at least a portion of, the tax on income. The restitution obligation follows the business owner, but it does not threaten the destruction of the business.

This offense was different for one primary reason: defendant artificially increased the amount of his officer's loan account without any corresponding revenues in NKS. Thus, defendant spent more money than NKS could afford to spend. In the process, he threatened the existence of a business that had been in his family for over 60 years, and the livelihood of numerous employees. NKS is still reeling in the wake of defendant's mismanagement and, for the first time since 1949, a Tigani does not run the company.

Both categories of offenses involve gaming the system for private gain on an impressive scale. The seriousness of each offense, standing alone, would merit imprisonment. When considered together, a substantial term of imprisonment is required.

**B.     Defendant's Conduct Remains Illegal post-<u>Citizens United</u>, and, Regardless, He Believed It to be Illegal at the Time of his Offenses**

Curiously, defendant argues that the "unsettled law of corporate campaign contributions" should lead the Court to impose a probationary sentence. Def.'s Sent. Memo. at 17. In so doing, defendant cites the Supreme Court's recent decision in <u>Citizens United v. Federal Election Comm'n</u>, 130 S.Ct. 876, 903 (2010), in which the Court held that the ban on independent corporate *expenditures* violated the First Amendment. Since <u>Citizens United</u> involved the same statutory subsection as Count One of the Information, 2 U.S.C. § 441b(a), defendant posits that: (1) the ban on direct corporate *contributions* may also violate the First Amendment; and (2) even if not, defendant's conduct is not that serious because he could have used NKS funds to make independent expenditures or contribute limitless funds to a Super PAC. Defendant claims that to incarcerate him "now for actions that might have been avoided had he known his company's rights as articulated in <u>Citizens United</u>, is not a just punishment." Def.'s Sent. Mem. at 18. That logic fails on several levels.

First, the Supreme Court has consistently upheld direct contribution limits against First Amendment challenges, drawing a clear distinction between expenditure limits and contribution limits. <u>See, e.g.</u> <u>McConnell v. Fed. Election Comm'n</u>, 540 U.S. 93, 134–35 (2003) (overruled by <u>Citizens United</u>, 130 S.Ct. at 913, as applied to independent campaign expenditures but not as applied to campaign contributions) (collecting cases). Even if the Supreme Court reversed longstanding precedent to overturn the ban on direct corporate contributions (and so far only one district court has reached that conclusion), corporations would remain subject to the same contribution limits as actual persons. In this case, NKS, through defendant, made over $120,000.00

18

in direct contributions to federal candidates and a political party – well over the $2,300.00 direct contribution limit in place for the 2008 election cycle, and in violation of direct contribution limits.

Second, defendant's argument ignores completely that he pleaded guilty to two distinct elections offenses. Count One charged defendant with violating the prohibition on direct corporate contributions to federal candidates. See 2 U.S.C. § 441b(a). Count Two, however, charged defendant with using straw donors to make illegal campaign contributions. See 2 U.S.C. § 441(f). Nothing in <u>Citizens United</u> suggested that Congress lacked the ability to criminalize illegal conduit contributions. In fact, the United States Court of Appeals for the Third Circuit has upheld the constitutionality of § 441f in the face of a First Amendment challenge. <u>Mariani v. United States</u>, 212 F.3d 761, 775 (3d Cir. 2000). Thus, even assuming that the ban on direct corporate contributions will be found to be unconstitutional, defendant's use of conduit contributors would result in the same Guidelines range.

Finally, defendant's argument repeats a troubling pattern of minimizing his conduct. The federal elections statutes violated by defendant, 2 U.S.C. § 441b and 441f, contain a willfulness component. That is, the defendant may only be convicted upon proof not only that he engaged in the illegal act, but also that he was aware his conduct was unlawful. Defendant admitted to federal agents that he was aware that his conduct was unlawful, and that notwithstanding its illegality, he acted to garner political influence. Now he attempts to argue that we should forget about his misdeeds because he would, if he could, go back in time and contribute to a hypothetical Super PAC. Given defendant's pervasive disregard of the law to date, that argument must be viewed with skepticism.

### C.    A Term of Imprisonment Would Serve a Powerful Measure of Deterrence

Based upon the heavy media interest in defendant's case, the rarity of criminal prosecutions for campaign finance offenses, and the low proportion of criminal tax convictions in relation to the number of tax violations nationwide, a term of imprisonment would serve a powerful measure of deterrence to the public.

First, defendant and his supporters have alluded to the heavy media interest surrounding defendant and his activities over the past several years.  A LexisNexis search of the name "Chris Tigani" resulted in at least ten significant news articles in the Delaware News Journal regarding defendant – many of them on the front page – over the last two years.  This case, quite simply, is one that many people across the State are watching.  A term of imprisonment will send a strong message that engaging in political corruption has severe consequences, and it will hopefully deter others from acting similarly.

Second, the limited number of criminal prosecutions involving campaign finance and tax offenses amplifies the need for a sentence of incarceration to deter other would-be offenders. Federal elections violations are challenging to prosecute.  At the outset, it is often difficult to detect the use of conduit contributors.  Many offenders who use employees to make illegal conduit contributions conceal the offense by repaying third-party contributions in the form of bonuses and other off-the-books payments.  In addition, even if such payments are discovered, the government must prove the defendant's awareness that his conduct was illegal.  As a result, campaign finance investigations entail a significant use of government resources to review financial records, emails and other communications, and to conduct numerous interviews with possible witnesses associated with the offender and the campaign that received the illegal

20

contributions.  For these reasons, Sentencing Commission statistics indicate that only four such prosecutions were brought nationwide in 2010.  See "Use of Guidelines and Specific Offense Characteristics Fiscal Year 2010," UNITED STATES SENTENCING COMMISSION (Available at: http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Guideline_Application_ Frequencies/2010/10_glinexgline.pdf) (Accessed February 27, 2012).  When such cases are uncovered and prosecuted, they provide an important opportunity for sentencing courts to deter others from engaging in similar activities.

Finally, courts have frequently recognized the applicability of general deterrence in tax cases.  A sentence of incarceration for tax cheats helps to promote respect for the law and to deter others from engaging in similar financial offenses.  As the Court is aware, all criminal tax prosecutions are subject to strict guidelines and Department of Justice approval, and a relatively limited number of criminal tax cases are brought each year in relation to the number of likely tax violations nationwide.  The Sentencing Guidelines provision relating to tax prosecutions references the limited number of prosecutions and the need for sentences in tax cases to promote respect for law and to deter would-be violators:

> Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws.  Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.  Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Manual ch.2, pt.T, intro. cmt.  A significant term of imprisonment in this case will help satisfy these important policy considerations.

**D.    A Term of Imprisonment Would Not Result in an Unwarranted Sentencing Disparity**

Defendant suggests that imposing a term of imprisonment on the election and tax offenses would involve an unwarranted sentencing disparity because, on occasion, courts have declined to do so. As an initial response, it is difficult to conceive of how the government's recommended sentence here, which constitutes a *downward variance from the Guidelines range*, would result in an unwarranted sentencing disparity. Regardless, the Court of Appeals has criticized the contention that a sentence imposed on one defendant in a distinct case automatically sets the ceiling that should be imposed in another:

> That [the defendant] can find another case where a defendant charged with a somewhat similar crime and facing the same advisory sentencing range received a sentence outside of the applicable sentencing range does not make [the defendant's] within-Guidelines sentence unreasonable. If that were the law, any sentence outside of the Guidelines range would set precedent for all future similarly convicted defendants. This is not, and cannot be, the law. Although a similar sentence might also be reasonable here, that does not make [the defendant's] sentence unreasonable. Reasonableness is a range, and our job is to ensure that the district court properly exercised its discretion by imposing a sentence within the range of reasonableness that is logically based upon, and consistent with, the § 3553(a) factors.

United States v. Jimenez, 513 F.3d 62, 91 (3d Cir. 2008).

Defendant's sentencing memo references a number of sentences imposed for campaign finance violations. In some cases, the defendants received probationary sentences. In others, including cases involving conduct similar to defendant, offenders received substantial terms of imprisonment. See, e.g., United States v. Magliochetti, No. 10-CR-286 (E.D. Va. 2010) (imposing a 27-month sentence on a defendant who engaged in a five-year scheme to funnel illegal conduit contributions to congressional candidates and who faced a similar Guidelines range (46-57 months' imprisonment) to defendant). Yet, each case stands on its own facts, and

22

defendant's conduct (as outlined in detail above) was broad, egregious, and pervasive enough to

merit a term of imprisonment on the campaign finance violations alone.

In support of his claim that a non-custodial sentence is appropriate, defendant separates

his campaign finance violations from his tax crimes, and discusses each independently.

Although it is convenient to cite cases in which a defendant did not receive a jail sentence for a

campaign finance offense, or a jail sentence for a tax offense,[13] defendant perpetrated two distinct

criminal schemes.  That important distinction provides another basis for the Court to reject

defendant's argument that a term of imprisonment would lead to an unwarranted sentencing

disparity, and to impose a substantial term of imprisonment on this particular defendant.

---

[13]Defendant references three probationary sentences imposed by this Court in tax cases, in 2004 and 2008, respectively, to suggest that any term of imprisonment in this case would result in an unwarranted sentencing disparity.  Yet, defendants sentenced on tax (and, at times other) offenses in this District have received significant terms of imprisonment over the same time period.  See, e.g., United States v. Dorsey, Crim. No. 10-91-SLR (sentencing Troy Dorsey to 41 months' imprisonment and Monnie Dorsey to 12 months and one day imprisonment); United States v. Connor, Crim. No. 09-68-SLR (sentencing the defendant to 27 months' imprisonment); United States v. Bright, Crim. No. 09-62-GMS (sentencing the defendant to six months' imprisonment); United States v. Holley, Crim. No. 08-138-SLR (sentencing the defendant to 48 months' imprisonment); United States v. Funk, Crim. No. 08-138-SLR (sentencing the defendant to 36 months' imprisonment); United States v. Zhu, 09-85-SLR (sentencing the defendant to 12 months and one day imprisonment); United States v. Toppin, 09-35-SLR (sentencing the defendant to 12 months and one day imprisonment); United States v. Levinson, 06-62-SLR (sentencing the defendant to 12 months and one day imprisonment); United States v. Daniels, 09-107-SLR (sentencing the defendant to 12 months and one day imprisonment); United States v. Richard, Crim. No. 08-24-SLR (sentencing the defendant to 6 months' imprisonment); United States v. Zuber, 07-01-SLR (sentencing the defendant to 5 months' imprisonment); United States v. Garrett, Crim. No. 06-123-SLR (sentencing the defendant to 6 months' imprisonment); United States v. Adjei, Crim. No. 06-55-GMS (sentencing the defendant to 51 months' imprisonment on fraud and tax offenses, with an additional 24 months on a count of aggravated identity theft).

**E.    Defendant's Cooperation Deserves Consideration, But Not to the Level Defendant Suggests**

One of defendant's primary arguments to avoid imprisonment is that his "immediate and substantial cooperation in federal and state law enforcement investigations of illegal conduct in connection with campaign fundraising activity[.]" Def.'s Sent. Mem. at 3.  The government acknowledges defendant's willingness to assist in the investigation of public corruption in Delaware, but it disputes the overall value of the information that defendant provided.  Thus, although the government agrees that some credit should be afforded to defendant for his efforts, it disagrees substantially that defendant's interaction with law enforcement should result in a probationary sentence – particularly given the government's discretion, at the front end, not to charge defendant with additional criminal offenses, and its intent not to seek a criminal fine if a substantial term of imprisonment is imposed.

The government described defendant's efforts toward cooperation in a letter to Senior Probation Officer Walter Matthews.  As noted in that letter, defendant's efforts to date have not resulted in the prosecution of any individuals for federal criminal offenses.  Therefore, the government has no basis to file a formal motion for a departure from defendant's Guidelines range pursuant to U.S.S.G. § 5K1.1.  However, to recognize defendant's efforts, the government has agreed to recommend a sentence that is one year less than the low-end of the Guidelines range, and nearly one-half lower than the top of the range.

The government strongly disagrees that defendant's cooperation should result in a non-custodial sentence.  In addition to agreeing to recommend a sentence below the Guidelines range, the government did not charge defendant with any additional criminal offenses, despite strong

evidence of additional misconduct, outlined above.  Moreover, the government does not intend to request a fine if the Court imposes a substantial term of imprisonment.  The government reached this conclusion in recognition of defendant's restitution obligations for his tax offenses, as well as the probability that defendant may have to pay a significant fine to the State of Delaware for his illegal state conduct.[14]

Therefore, although the Court should certainly consider defendant's efforts at cooperation in fashioning an appropriate sentence, the government respectfully requests that the nature of that cooperation does not merit a probationary sentence.

### F.    Other Factors Identified by Defendant Should Not Result in a Probationary Sentence

Defendant mentions a number of other factors in support of a probationary sentence, which merit a brief response.

First, defendant should be commended for addressing serious issues in his personal life, PSR ¶ 124, and for becoming a very active and devoted father.  Compare PSR ¶ 101.  Defendant contends that incarceration at this stage would negatively impact his young children.  Many defendants, however, have children and families, and incarceration affects them all.  Although defendant's incarceration will impact his family in a negative fashion, that "hardship is similar to that experienced by many if not most families of convicted felons."  See, e.g., United States v. Kennedy, 554 F.3d 415, 425-26 (3d Cir. 2009)

It is also commendable that defendant has been able to grow a new business despite the challenges of pending civil and criminal liability, thus demonstrating his immense talent as a

---

[14]Defendant's cooperation in the State investigation will be considered by the Independent Counsel in that forum.

businessman. The government disagrees, however, with defendant's suggestion that the business will automatically fail if he is incarcerated. To date, defendant's guilty plea has not had a major negative impact on his business. He settled his civil case with his father and is in the process of receiving a significant monetary settlement. He started a new business, in the same industry, which has continued to grow. Nearly 30 suppliers and 200 new customer accounts in Delaware have not shunned defendant on the basis of his felony conviction. Moreover, the State of Delaware did not strip defendant of his liquor license for committing the offenses, but only suspended his license for a period of seven days and imposed a minimal fine. See "Tigani's Liquor License Suspended," THE NEWS JOURNAL (Aug. 3, 2011).

Defendant further hired former NKS employees with experience in the industry – including a former NKS Vice President who ran a separate business unit of NKS – to join him in his new venture. These employees were aware of defendant's potential civil and criminal liability at the time they joined his enterprise, and they have remained with defendant despite a nine-month lapse between defendant's guilty plea and his sentencing. Their experience with customers and distributors should help the new company weather any absence of defendant due to his incarceration. In fact, defendant told the Delaware Alcohol Beverage Control Commissioner that the former NKS Vice President will run the business when defendant is incarcerated. Id.

Finally, contrary to defendant's suggestion the interests of the community may continue to be served while he is incarcerated. There is no reason to believe that his current business could not participate in the Probation Office's Workforce Development Program in defendant's absence.

26

## <u>Conclusion</u>

Defendant's calculated actions over a six-year period have helped to erode public trust in the electoral and legislative process.  His actions further led to the near dissolution of a company that had been in existence for over sixty years.  Defendant's pervasive criminal conduct merits a substantial term of imprisonment to punish him for his actions and to deter others from engaging in the "Delaware Way."  Accordingly, for all the foregoing reasons, the government respectfully requests the Court to impose a term of imprisonment of 25 months.

Respectfully Submitted,

DAVID C. WEISS
Attorney for the United States Acting
Under Authority Conferred By
28 U.S.C. § 515

BY:         *Robert F. Kravetz*
Robert F. Kravetz
Assistant United States Attorney

Dated: February 28, 2012

27