# EXHIBIT 4

Trial Transcript - Vol. X - 5/7/10 - NKS Distributors v Tigani - Del. Chanc. No. 4640-VCP

**SHEET 16   PAGE 2607**

**2607**

C. J. Tigani - Cross

1  Q. All right. In any event, by having a
2  domain or administrator password, you also had access
3  to all of the passwords used by everyone in the NKS
4  computer system; right?
5  A. Yes, I did.
6  Q. And any time you wanted to, that meant
7  you could simply print out a list of everybody's
8  passwords; right?
9  A. There was -- it's not that easy but,
10  yes, you can get their password. You don't just print
11  it out. It's on the screen and there's -- yes, you
12  can, but not print it out.
13  Q. All right. The passwords that you had
14  access to included not only everyone's NKS passwords
15  for the server, but also the passwords for their
16  personal accounts, such as AOL; correct?
17  A. Not everyone's. But if they used a
18  company computer, all of their information was
19  available.
20  Q. So if they used their -- if they used
21  the NKS computer to access an AOL account or some
22  other personal e-mail account, you had access to their
23  password; right?
24  A. Not all the time, no. It depends on

**PAGE 2608**

**2608**

C. J. Tigani - Cross

1  the time. It depends on when. Not from 2003 at all.
2  You know, Bob Tigani's, yes, we had access to and
3  others.
4  Q. All right.
5  A. That is in our handbook, as Internet
6  usage, it's covered under that.
7  Q. So if an NKS employee changed his or
8  her password, nevertheless you would still have access
9  to those passwords because you had the domain or
10  administrator status; isn't that right?
11  A. That's correct.
12  Q. Now, you had purchased over time a
13  variety of software packages to enable you to monitor
14  e-mail, didn't you?
15  A. Yes.
16  Q. And, for example, in February 2008,
17  you purchased something called SpectorSoft?
18  A. Yes.
19  Q. And that's described as a company-wide
20  monitoring software, isn't it?
21  A. Yes.
22  Q. All right. And that was specifically
23  designed to be installed on Apple Macintosh computers;
24  right?

**PAGE 2609**

**2609**

C. J. Tigani - Cross

1  A. I put it on my own.
2  Q. Because that's what you use, an Apple,
3  isn't that correct?
4  A. Right.
5  Q. You bought three licenses for that
6  software?
7  A. Yes.
8  Q. So you installed them on your computer
9  at the office and also one at home?
10  A. I don't think -- I only installed it
11  on one. I don't know if I installed it on two. I
12  think you have to buy three licenses. I'm not sure.
13  Q. In April 2008 you purchased a software
14  called Kernel Recovery for Outlook Express password;
15  right?
16  A. Yes.
17  Q. That was a software that was intended
18  to be able to access people's passwords?
19  A. I don't know if it was or not. I
20  didn't use that. I believe I testified that I didn't
21  use it.
22  Q. You didn't use the software?
23  A. Right.
24  Q. You didn't use it because you found

**PAGE 2610**

**2610**

C. J. Tigani - Cross

1  out you already had access to the passwords by other
2  means; right?
3  A. I was putting my documents together.
4  And I keep all my e-mail. And I get new computers
5  periodically and I save my computers. And I have
6  e-mails stored from many years ago. That's how come I
7  can produce a document from 2003 that's not on the
8  server. And sometimes, when they're password
9  protected, you need to use it to get into your own
10  e-mail. So that's what those things are intended to
11  be used for. That specific program I never used.
12  Q. All right. In April 2008, same time
13  period, you signed up for a course on how to hack into
14  computers, didn't you?
15  A. Yes.
16  Q. And that was through a company called
17  Offensive Security; right?
18  A. Yes.
19  Q. And you recall being down in the
20  Caribbean April 29 and 30, 2008, and spending a good
21  bit of time down there e-mailing back and forth with a
22  gentleman named Mr. Hadnagy from Offensive Security?
23  A. Yes.
24  Q. And you were trying to hack into NKS's

Trial Transcript - Vol. X - 5/7/10 - NKS Distributors v Tigani - Del. Chanc. No. 4640-VCP

SHEET 17   PAGE 2615

**Page 2615**

C. J. Tigani - Cross

1  Q.   You didn't produce a privilege log,
2  did you?
3  A.   No. But I produced all my documents
4  anyway.
5  Q.   You didn't withhold privileged
6  documents?
7  A.   I redacted some documents. I withheld
8  some clearly privileged documents from Mr. Clark. But
9  a lot of those documents have been produced. But no,
10 I did not produce a privilege log.
11 Q.   Okay. Now, you formerly had an
12 employee at NKS named ████████ right?
13 A.   NKS employed ████████ yes.
14 Q.   And there was an employment dispute
15 with him; correct?
16 A.   Yes.
17 Q.   And there was a suit. And in
18 connection with that suit you started reading his
19 e-mails in about November 2007; right?
20 A.   I read his e-mail for about a week.
21 Q.   Okay. And in his case you even went
22 into his online Fidelity Investments account called a
23 529B account through an online service; is that right?
24 A.   Yes.

**Page 2616**

C. J. Tigani - Cross

1  Q.   Okay. And in order to do that you
2  first had to get his password from the NKS server;
3  right?
4  A.   Correct.
5  Q.   And you also had to get his Social
6  Security number. So you directed Darlene Wunner to
7  get that for you; correct?
8  A.   I guess I did. I may have.
9  Q.   Okay. And then you needed a password
10 that Chris Clifton got for you, and Chris Clifton was
11 the IT director at NKS; right?
12 A.   Yes.
13 Q.   And you used all that information and
14 went into ████████'s Fidelity Investments account;
15 right?
16 A.   That is because ████████ entered
17 into an agreement with a supplier to deposit money
18 into his children's 529B college savings account plan
19 in order to get Anheuser-Busch wholesalers to
20 improperly invest in Tequila. He was taking a
21 kickback and putting it into his account. I found out
22 about it because he recommended that NKS buy
23 $2 million worth of Tequila. And a brand-new Tequila.
24 I said you must be getting something under the table.

**Page 2617**

C. J. Tigani - Cross

1  Sure enough he was.
2  Q.   Did you know it was illegal for you to
3  go into his 529B account?
4  A.   I did not.
5  Q.   Okay. Do you recall asking Chris
6  Clifton to get you the passwords for ████████'s bank
7  accounts at Wilmington Trust Company and
8  Bank of America?
9  A.   It wouldn't surprise me, but I didn't
10 look at them.
11 Q.   But you had -- you obviously got the
12 passwords because you wanted to be able to have the
13 ability to look at them; right?
14 A.   If he had put NKS money or kickback
15 money into his Wilmington Trust account, when I looked
16 at his Fidelity account I saw that there was no
17 activity left. And he was fired the next day or the
18 day after and I never looked at his accounts again.
19 Q.   Do you recall, sir, that in the ████████
20 litigation, the Delaware Superior Court determined
21 that you had intentionally destroyed a hard drive that
22 was evidence in the case?
23 A.   I believe that's what was determined.
24 That was completely in error. And I did not

**Page 2618**

C. J. Tigani - Cross

1  intentionally destroy a hard drive. And the Court
2  misunderstood what had happened.
3  Q.   Okay. Who was the judge who made that
4  error by determining that you had intentionally
5  destroyed evidence?
6  A.   I honestly don't remember his name.
7  Q.   Okay.
8  A.   Your Honor, I would like to explain
9  that, if you would allow me.
10          THE COURT: You'll get your time in
11 redirect. You should keep a note of it -- that you
12 want to mention that topic.
13 BY MR. GALLAGHER:
14 Q.   Just to identify the order, would you
15 turn to NKS/RFT Exhibit 379 which is at Tab 50 of your
16 witness binder.
17          THE COURT: I'm sorry. Number again?
18          MR. GALLAGHER: NKS/RFT Exhibit 379,
19 and it's at Tab 50.
20          THE COURT: All right.
21          THE WITNESS: Judge Scott.
22 BY MR. GALLAGHER:
23 Q.   Okay.
24 A.   Your Honor, may I explain it now? No.